1
2
3
4
5
6

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

7

| | | |
|---|---|---|
| DENNIS MCCABE, | ) | 3:09-cv-00244-LRH (WGC) |
| 8 Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| 9 vs. | ) | **OF U.S. MAGISTRATE JUDGE** |
| 10 JIM GIBBONS, et al., | ) | |
| 11 Defendants. | ) | |
| 12 | ) | |

13    This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior

14 United States District Judge. The action was referred to the undersigned Magistrate Judge

15 pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

16    Before the court is Plaintiff's motion for summary judgment. (Doc. # 119.)[1] Defendants

17 filed an opposition and cross-motion for summary judgment. (Doc. # 130 and errata at Doc.

18 # 142.)[2] Plaintiff filed an opposition to Defendants' cross-motion which also appears to be his

19 reply in support of his motion for summary judgment. (Doc. # 145.) Defendants then filed a

20 reply, an errata and an amended reply. (Docs. # 147, # 148, # 149.)[3] In addition, Plaintiff filed

21 a declaration in support of his motion and his opposition to Defendants' motion. (Doc. # 150.)

22    After a thorough review, the court recommends that Plaintiff's motion for summary

23 judgment be denied, and that Defendants motion for summary judgment be granted in part

24

25    [1] Refers to court's docket number.

26    [2] The errata contains a signed version of the declaration of Howard Skolnik.

27
28    [3]The errata merely indicates that an amended reply was filed to correct the duplication of words/phrases that occurred in converting the reply document to PDF format. The court will therefore only refer to the amended reply set forth in Doc. # 149 in conducting its analysis.

1  and denied in part.

2  <u>**I. BACKGROUND**</u>

3  At all relevant times, Plaintiff Dennis McCabe was in custody of the Nevada Department

4  of Corrections (NDOC). (Pl.'s Am. Compl.  (Doc. # 25) 1.) The allegations giving rise to this

5  action took place while he was housed at Ely State Prison (ESP). (*Id.*) Plaintiff brings this

6  action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants are NDOC Medical Director Robert

7  Bannister, former ESP Nursing Director Joseph Brackbill, Nevada Attorney General Catherine

8  Cortez Masto, former ESP Warden E.K. McDaniel, former Nevada Governor Jim Gibbons, ESP

9  Correctional Officer Erik Lyons, ESP Nurse Gregory Martin[4], Nevada Secretary of State Ross

10  Miller, former ESP Correctional Officer Stephen Saunders, and former NDOC Director Howard

11  Skolnik. (*See* Doc. # 25, Doc.  # 51, Doc. # 130 at 4-6, 9, 12.)[5] While Plaintiff filed this action

12  pro se, he is now represented by counsel, Dan M. Winder, Esq. (*See* Notice of Appearance at

13  Doc. # 138.)

14  **A. Plaintiff's Claims**

15  On screening, the court found that Plaintiff sets forth colorable claims under the Eighth

16  Amendment for deliberate indifference to a serious medical need and retaliation under the

17  First Amendment.  (*See* Docs. # 25, # 43, # 51.)

18  In Count I, Plaintiff asserts a claim for violation of the Eighth Amendment as a result

19  of deliberate indifference to his serious medical needs related to his spinal stenosis.[6] (Doc. #

20  43 at 3-6.) Plaintiff claims that it has been a matter of medical record for approximately eight

21  and one-half years that he requires surgery to correct his spinal stenosis.  (Doc. # 25 at 20.) He

22  

23  [4]Wrongly named by Plaintiff as Martin Gregory.  (*See* Doc. # 91 at n.  2.)

24  [5]Supervisory defendants Skolnik, Bannister, Brackbill, McDaniel, Gibbons, Miller, and Cortez-Masto were
25  originally dismissed on screening, but reinstated on reconsideration in light of the Ninth Circuit's decision in *Starr
v.  Baca*, 652 F.3d 1202 (9th Cir.  2011), *cert. denied*., 132 S.Ct. 2101 (2012). (*See* Doc. # 51.)

26  [6] Spinal stenosis is "a narrowing of spaces in the spine (backbone) that results in pressure on the spinal
27  cord and/or nerve roots." NIH, Nat'l Inst. of Arthritis and Musculoskeletal and Skin Diseases, What is Spinal
Stenosis? (Jan. 2013), http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/ (last visited July 22, 2013).

28

asserts that this case and those of other inmates were investigated in 2008, and that the investigation made prison officials aware of his condition and the inadequate medical treatment he has received. (*Id.* at 20-22.) Plaintiff alleges he has received no treatment for his condition, despite the fact that surgery has been recommended on at least two occasions. (*Id.* at 6-7.) Plaintiff claims that his condition has deteriorated throughout the years, causing his symptoms to worsen to the point that he has no feeling in either leg or in his left foot. (*Id.* at 7.) He asserts that he experiences bladder and bowel incontinence sporadically, and often falls down, causing further injury. (*Id.* at 5-7.) Plaintiff contends that prison officials are aware of his condition and have knowingly and deliberately refused treatment, which has inflicted ongoing pain and suffering. (*Id.* at 9-10.) This claim is asserted against Howard Skolnik, Robert Bannister, Joseph Brackbill, E.K. McDaniel, Jim Gibbons, Ross Miller, Gregory Martin, and Catherine Cortez Masto. (*See* Doc. # 43, Doc. # 51, Doc. # 130 at 4.)

In Count II, Plaintiff asserts a claim for violation of the Eighth Amendment as a result of deliberate indifference to his serious medical needs by defendant Gregory Martin. (Doc. # 43 at 6.) Plaintiff alleges that on September 11, 2008, defendant Martin told Plaintiff he was a licensed physician and that he was going to prescribe Plaintiff medication and treatment for spinal stenosis, umbilical hernia, and ganglion cyst; however, Plaintiff alleges he subsequently learned that defendant Martin was not a physician, but a nurse. (Doc. # 25 at 26.) Plaintiff further asserts that he received neither treatment nor medication for these conditions. (*Id.* at 27.)

In Count III, Plaintiff asserts a retaliation claim against defendants Saunders and Lyons. (*See* Doc. # 43.) Plaintiff alleges he was subjected to retaliation in violation of his rights under the First Amendment when on March 6, 2009, defendants Saunders and Lyons, acting under the guise of a shakedown, "trashed" Plaintiff's cell and confiscated and destroyed legal correspondence. (Doc. # 25 at 29-30.)

///

///

3

**B. Summary of Briefing**

    **1. Plaintiff's Motion for Summary Judgment (Doc. # 119)**

    Plaintiff claims that Defendants were deliberately indifferent to his serious medical need when they knew of and failed to treat his spinal stenosis, umbilical hernia and ganglion cyst. (Doc. # 119 at 2.) He further asserts that defendants Saunders and Lyons retaliated against him when they took and discarded his legal papers because he was filing grievances related to his medical issues. (*Id.*) Plaintiff's motion is lengthy and cites to a multitude of supporting documents. As a result, the court will categorize and provide a summary of each of his arguments below.

    **a. Medical Care Claims**

    *I. Spinal Stenosis*

    Plaintiff recounts his medical history relative to spinal stenosis starting in the 1990s, asserting that it is relevant to show that the Defendants were aware of his condition, and thus were deliberately indifferent when they failed to provide him with treatment starting in 2007 (two years preceding the filing of his complaint). (*See* Doc. # 119 at 40.)

    Plaintiff argues that spinal surgery was recommended on at least two occasions, but he was told that the State's insurance carrier refused to pay for his surgery. (Doc. # 119 at 6.) He asserts that spinal stenosis only responds to surgery, and the longer the spinal nerves are under pressure, the less likely they are to return to normal. (*Id.* at 27, citing Exhibit 4-B.)

    A. 1990s through 2004

    Plaintiff claims that in 1994, x-rays of his spine revealed a mild narrowing of the L5-S1 disc spaces, which suggested spinal stenosis. (*Id.* at 27-28.) In 1995, he saw Dr. Potter at ESP, who prescribed medication, some of which was effective. (*Id.* at 28.) In 1997, Plaintiff requested treatment for his spinal condition, and was referred to a neurologist who performed an electromyogram which revealed abnormal results. (*Id.*, citing Exhibit 4-A at 6-7.) Despite these results, his notes upon transfer from Nevada State Prison to ESP indicated that Plaintiff had no acute problems. (*Id.*) In 1998, Plaintiff was told he had spinal stenosis and that an MRI

1   would be ordered. (*Id*.) Plaintiff asked to put off the MRI while he was dealing with a family

2   tragedy. (*Id*. at 28-29.)

3        In 1999, Plaintiff went to Northern Nevada Correctional Center (NNCC) and saw an

4   orthopedist for an MRI, but never received the MRI. (*Id*. at 29.) In 2000, he contends that

5   prison doctors failed to provide him with corrective surgery. (*Id*. at 31.) In 2001, he was again

6   diagnosed with spinal stenosis as well as foraminal stenosis after an MRI was performed in

7   March of 2001; however, he asserts that despite this finding, one prison doctor wrote a note

8   that there was no evidence of spinal stenosis. (*Id*.) He asserts that no corrective action was

9   taken. (*Id*.)

10        In 2002, Plaintiff was referred to three neurologists, Dr. Kabins, Dr. Venges and

11   Dr. Garber. (*Id*. at 31-32.) He states they noted that the failure to correct his condition would

12   result in life-altering pain and permanent nerve damage. (*Id*. at 32, citing Exhibit 4-A at 1,2.)

13   Yet, Plaintiff asserts that prison doctors did nothing to remedy his condition. (*Id*.) He claims

14   that he was not even given ibuprofen. (*Id*.) Plaintiff claims that surgery was also recommended

15   by Dr. Farrow in 2002. (*Id*., citing Exhibit 1-X at 8.)

16        In 2003, Plaintiff saw Dr. Garber for a follow-up visit, and told Plaintiff he had

17   spinal/foraminal stenosis and explained that surgery would correct the condition. (Doc. # 119

18   at 32-33.) He claims that the surgery referral was submitted to the Utilization Review Panel,

19   but the surgery referral was rejected on January 16, 2003. (*Id*. at 33.)

20        Plaintiff contends that because of a budget crisis in 2004, NDOC cut prison programs

21   and medical services. (Doc. # 119 at 33, citing Exhibit 3-W at ¶ 20; Exhibit 1-B at 35:8-18;

22   Exhibit 1-C; Exhibit 1-E at 3 ¶ 3; Exhibit 1-F at 4 ¶ 2; Exhibit I-H at 1 ¶ 3, 2 ¶ ¶ 7 and 9, 3 ¶ 1.)

23                                               B. 2007-forward

24        Plaintiff then addresses his medical condition from the time period beginning in 2007.

25   (Doc. # 119 at 34-35.) Plaintiff states that Defendants will assert that his medical records were

26   silent about back pain from 2004 to 2008, but believes this was done by design. (*Id*. at 35.)

27   Plaintiff contends that in 2007, each of the Defendants received a report informing them of

28

Plaintiff's medical conditions which was prepared by Dr. William Noel, who was retained by the American Civil Liberties Union (ACLU) when it undertook an investigation into health care at ESP, and subsequently filed a class action lawsuit on behalf of various inmates at ESP, *Riker v. Gibbons*, 3:08-cv-00115-LRH-VPC. (*Id.*, citing Exhibit 1-2 at 19.)[7]

Plaintiff provides a lengthy description of the ACLU's investigation into the provision of health care at ESP (a more detailed discussion is contained in the court's analysis of Plaintiff's Eighth Amendment claims below). (Doc. # 119 at 9-11.) He also discusses the involvement of the Nevada legislature, the Federal Public Defender's Office, the Board of Prison Commissioners (which at that time consisted of defendants Gibbons, Cortez Masto, and Miller) and litigation surrounding these issues in the *Riker* action. (*Id.*) He provides declarations by former NDOC employees utilized in connection with the ACLU's investigation and the *Riker* litigation. (Doc. # 119 at 13, Exhibits 1-D, 1-E, 1-F, 1-G, and 1-H.)

Then, Plaintiff describes his medical care in 2008. (Doc. # 119 at 36.) Plaintiff states that he was seen by defendant Martin for a physical, and Martin claimed to be a doctor when he was actually a nurse. (*Id.*) Defendant Martin ordered an x-ray of Plaintiff's lumbar spine, and ordered that Plaintiff be prescribed ibuprofen, and instructed that Plaintiff should be seen for a follow-up exam in two weeks time. (*Id.*) Plaintiff further claims that Martin promised to treat the spinal stenosis. (*Id.*) Plaintiff contends, however, that Martin did not provide any treatment. (*Id.*) He asserts that the x-rays were not taken, and he was not issued ibuprofen. (*Id.*) Plaintiff further argues that two weeks later, he knew that Martin was not a doctor and could not prescribe Plaintiff anything except for Tylenol. (*Id.* at 36-37.) Thus, the follow-up appointment did not take place, and Plaintiff was only prescribed medication for cholesterol and heartburn, not for spinal stenosis. (*Id.* at 37.) Plaintiff claims that after he filed his lawsuit in 2009, the orders for x-rays and medication entered by defendant Martin were discontinued. (*Id.*) He says he was only ever given a handful of Tylenol. (*Id.*, citing Exhibit 3-W at 2:5.)

---

[7]Plaintiff has since retained Dr. Noel as an expert on his behalf in this action.

1    Plaintiff asserts that in 2009, defendant Martin tried to get a psychiatrist, Dr. Mahakina,

2    to prescribe Plaintiff ibuprofen for his back pain, but he refused because he was not a pain

3    doctor. (Doc. # 119 at 37-38.)

4    Plaintiff claims that after some defendants were served with the lawsuit in this case,

5    defendant Martin told Plaintiff that he could start prescribing drugs for his spinal stenosis, but

6    that he could not make a surgery recommendation. (Doc. # 119 at 38.) Plaintiff asserts that he

7    told Martin that the medication was only masking the pain, and asked about the status of

8    surgery, but never received a reply. (*Id.*) Plaintiff states that he has still not been advised why

9    surgery was denied or whether he will be provided with surgery. (*Id.*) Plaintiff asserts that he

10   has continued to request treatment for the spinal stenosis, to no avail. (*Id.* at 38-39.) He says

11   that he was advised in 2010 by Dr. Mar that they would like him to follow up with the providers

12   at ESP, but Plaintiff claims ESP had no doctor, and only Nurse Martin. (*Id.* at 39.)

13                    C. Examination by Dr. Noel in 2012 and attack on credibility of

14                              defense expert, Dr. Hellerstein

15   Plaintiff then states that in 2012, his retained medical expert, Dr. Noel, conducted a two-

16   day physical evaluation of Plaintiff and submits Dr. Noel's report in support of his motion.

17   (Doc. # 119 at 41, citing Exhibit 4-D.)

18   Plaintiff attacks the credibility of defense medical expert, Dr. Hellerstein. (Doc. # 119

19   at 41-42.) He asserts that his expert, Dr. Noel, should be believed over Dr. Hellerstein because

20   Dr. Hellerstein did not tour ESP in 2007, and review medical records at ESP, as Dr. Noel did.

21   (*Id.*) In addition, he contends that Dr. Hellerstein has never interviewed or conducted a

22   physical examination of Plaintiff. (*Id.*)

23                              *ii. Ganglion Cyst*

24   Regarding the ganglion cyst, Plaintiff acknowledges Defendants' argument that it is not

25   referenced in the medical records, but maintains that he suffered from a ganglion cyst in his

26   right wrist, and previously had a ganglion cyst in his left wrist which was surgically removed,

27   but none of this shows up in ESP's medical records, implying that the records are inaccurate.

28

(Doc. # 119 at 42.)

### iii. Umbilical Hernia

Plaintiff similarly claims that the umbilical hernia is mysteriously missing from his medical records. (*Id*.) Plaintiff asserts that it was surgically induced by Dr. Pitts at Carson Tahoe Hospital in 1989, but Dr. Pitts died before he could repair the hole he cut in Plaintiff. (*Id*.) He asserts that the hernia was never repaired. (*Id*. at 43.)

### iv. Miscellaneous arguments relative to Plaintiff's medical care claims

Plaintiff asserts that he could not access medical treatment due to staffing issues and poor medical practices, and that there were unprofessional responses to inmate medical requests. (Doc. # 119 at 13 citing Exhibits 1-D at 7-8, 1-E at 3, 1-F at 3, 1-G at 1, 3, and 1-H at 1-2.) He maintains that medical treatment as well as medical orders from doctors at other institutes were improperly discontinued. (*Id*. at 13-14, citing Exhibits1-D at 4-5, 10, 1-E at 3, 1-G at 2, 1-H at 2.)

Plaintiff also claims he received inadequate treatment for chronic care. (Doc. # 119 at 15, citing Exhibits I-D at 3, I-3 at 2.) He asserts there were unprofessional medical charting practices. (*Id*. at 15, citing Exhibits 1-D at 8-9, 1-G at 2, 1-H at 3.) He references medication shortages and untimely refills of medication. (*Id*. at 15, citing Exhibits I-E at 3, 1-G at 3.) He further contends that there was a lack of access to emergency medical services and inadequate emergency medical training. (*Id*., citing Exhibit 1-E at 2-3.)

### v. Liability of Skolnik, Bannister, Brackbill, McDaniel, Gibbons and Cortez Masto

Plaintiff maintains that defendants, Skolnik, Bannister, Brackbill, McDaniel, Gibbons, Miller and Cortez Masto, are subject to liability in this matter because they learned of an investigation being conducted by the ACLU, and received a report concerning the results of the ACLU investigation. (Doc. # 119 at 5, 6-7, 16-26, 51-54.) In addition, he claims that the defendants who were members of the Board of Prison Commissioners (Gibbons, Miller and Cortez Masto) were made aware of problems with the health care system in Nevada's prisons

8

because it was brought to their attention as well as the attention of the State legislature in 2007. (*Id.* at 8.) Despite this knowledge, Plaintiff argues that these defendants did nothing to remedy the situation. (*Id.* at 54-55.)

In addition, Plaintiff claims that defendant McDaniel inappropriately interfered in medical decisions. (Doc. # 119 at 15, citing Exhibits 1-D at 3, 5, 7, 11-12, 1-E at 1-2, 1-F at 2-4, 1-G at 3.)

Finally, Plaintiff references memoranda written by defendant Brackbill in 2004, regarding an asserted policy concerning treatment (or non-treatment) of chronic pain. (Doc. # 119 at 12., Ex. 1-C.)

### b. Retaliation Claim

With respect to his retaliation claim, Plaintiff asserts that defendants Saunders and Lyons, operating under the guise of a shakedown, confiscated and destroyed legal correspondence in Plaintiff's cell. (Doc. # 119 at 44.) Plaintiff believes this was done to threaten, intimidate and teach Plaintiff a lesson about filing grievances. (*Id.*) Plaintiff argues that Saunders and Lyons were not going to perform the confiscatory search anyway because Plaintiff's cell had already been searched twice that week. (*Id.* at 45.) Plaintiff claims that at the time there was a "once-a-month" shakedown policy in effect. (*Id.* at 46.) Plaintiff dismisses the fact that statements he made to these defendants prior to the search were the reason for the search. (*Id.* at 47.) Plaintiff says that defendant Saunders said, "I got rid of your excess paper," but it was only Plaintiff's legal documentation that was confiscated and Plaintiff maintains he had no "excess paper." (*Id.* at 47-48.) Plaintiff claims that he was told by other guards that Saunders was angry at Plaintiff because of the grievances he filed and the threat of a lawsuit. (*Id.* at 48.)

### 2. Defendants' Opposition to Plaintiff's Motion (Doc. # 130)

Defendants incorporate the evidence submitted in support of their own motion for summary judgment and argue that Plaintiff failed to meet his burden of demonstrating the absence of a genuine issue of material fact regarding his claims or that certain defendants were

9

1    liable in their supervisory capacity. (Doc. # 130 at 29-32.)

2         First, Defendants contend that most of the exhibits filed in support of Plaintiff's motion

3    are unrelated to his claims. (Doc. # 130 at 29.) In addition, they assert Plaintiff's medical

4    records from 1997 through 2003 are not probative of his claims, which they contend accrued

5    in September of 2008. (*Id.* at 29-30.)

6         Defendants then shift their focus to a critique of the report Dr. Noel created after

7    examining Plaintiff at ESP in June of 2012. (*See* Doc. # 130 at 30.) Defendants' expert,

8    Dr. Hellerstein, reviewed and provides commentary regarding Dr. Noel's report. (*Id.*, Ex. D,

9    Attachment 4 to Defs.' Mtn.) Dr. Hellerstein's opinion is that NDOC's conservative treatment

10   of Plaintiff's low back pain/spinal stenosis was acceptable under the circumstances and did not

11   pose an excessive risk to his health. (*Id.* at 30-31, Exhibit D, Attachment 3 to Defs.' Mtn.)

12   Defendants argue that this case boils down to a difference of opinion regarding Plaintiff's

13   medical care and there is no evidence that the care was medically unacceptable under the

14   circumstances. (*Id.* at 31.)

15        With respect to Plaintiff's retaliation claim, Defendants argue that Plaintiff's only

16   evidence in support of his claim is his self-serving affidavit regarding some documents that

17   were returned to him on March 9, 2009. (Doc. # 130 at 31.) Defendants contend that the

18   affidavits of defendants Saunders and Lyons refute Plaintiff's allegations, and the unauthorized

19   property form and grievances do not reflect the removal of the legal envelope from Plaintiff's

20   cell. (*Id.*) Defendants also include a cursory argument that Plaintiff "arguably" cannot proceed

21   with his retaliation claim because he failed to exhaust his administrative remedies on this issue.

22   (*Id.*)

23   ### 3. Defendants' Motion for Summary Judgment (Docs. # 130, # 142)

24        First, defendants Gibbons, Miller, Masto, Skolnik, and McDaniel argue that they are

25   relieved of liability because they did not personally participate in any alleged constitutional

26   deprivation and had no knowledge of Plaintiff's claims of alleged unconstitutional conduct by

27   other defendants in this action. (Doc. # 130 at 14-18.)

28                                     10

1   Second, Defendants argue, as they did in their opposition to Plaintiff's motion, that

2   Plaintiff improperly seeks to place his medical care and treatment prior to September 11, 2008,[8]

3   at issue because he did not exhaust his administrative remedies with respect to an alleged

4   denial of back surgery in January 2003, and these claims are barred by the applicable statute

5   of limitations. (Doc. # 130 at 18-21.) In addition, defendant Brackbill argues that to the extent

6   he is named due to the issuance of certain memoranda in 2004, Plaintiff's claim is barred by

7   the statute of limitations. (*Id*. at 21.)

8   Third, Defendants assert that they were not deliberately indifferent to Plaintiff's serious

9   medical needs. (Doc. # 130 at 22-25.) Specifically, Defendants provide Plaintiff's medical

10  records for the time period of September 11, 2008 through August of 2010, which they contend

11  demonstrate Plaintiff received appropriate medical care during the time period at issue. (*Id*.)

12  They further argue Plaintiff was never diagnosed with a ganglion cyst. (*Id*.) Finally, they

13  contend that while Plaintiff's medical care and treatment from the 1990s through 2003 is not

14  at issue in this case, they have provided an expert witness report by Dr. Hellerstein, who

15  reviewed Plaintiff's medical records dating back to 1990 and opines as follows:

16   (1) NDOC's conservative management of Plaintiff's spinal stenosis was acceptable under

17  the circumstances and did not pose an excessive risk to Plaintiff's health, and the decision to

18  disapprove a surgical referral in 2003 was not deliberately indifferent to Plaintiff's medical

19  needs;

20  (2) with respect to his umbilical hernia, Plaintiff was asymptomatic, the complications

21  of incarceration and potential strangulation were not inevitable, and Plaintiff was in a protected

22  environment where medical care was promptly available should a complication develop such

23  that the course of treatment was medically acceptable under the circumstances and did not

24  expose Plaintiff to a substantial risk of harm; and

25  (3) while Plaintiff filed a grievance in 2009 asserting a failure to treat a ganglion cyst in

26

27   [8]The heading of Defendants' argument references 2009, but the substantive argument presented by Defendants consistently references 2008.

28   11

his right wrist, his medical records only reveal that when he complained of wrist pain in 1990, he was treated with steroid injections, splints and NSAIDs, and otherwise Plaintiff was never diagnosed with a ganglion cyst.

(*Id*. at 24-25.)

Fourth, defendants Saunders and Lyons argue that Plaintiff cannot prevail on his retaliation claim because while they searched and confiscated several property items from Plaintiff's cell on March 6, 2009, they did not engage in offensive conduct and there is no record of the confiscation of an envelope which would have contained Plaintiff's legal materials. (Doc. # 130 at 25-27.) In addition, they assert that they were not aware of Plaintiff's grievance filings or litigation activities. (*Id*. at 27.) Finally, they assert that Plaintiff's First Amendment rights were not chilled because Plaintiff continued to have access to the grievance system and he has been able to pursue litigation. (*Id*.)

Fifth, Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims because the conservative approach taken by NDOC with regard to Plaintiff's back pain/spinal stenosis and umbilical hernia is supported and their conduct was reasonable. (Doc. # 130 at 27-28.)

Finally, Defendants contend they cannot be sued in their official capacity for damages. (Doc. # 130 at 28.)

**4. Plaintiff's Opposition to Defendants' Cross-Motion for Summary Judgment (Doc. # 145)**

First, Plaintiff argues that defendants Gibbons, Miller, Cortez Masto, Skolnik and McDaniel did personally participate in the constitutional deprivation because Dr. Noel's report from the ACLU investigation was discussed at a January 23, 2008 meeting of the Board of Prison Commissioners which was attended by these defendants. (Doc. # 145 at 1, Doc. # 145-1 at 37-55 (Ex. 8).)

Plaintiff further asserts that defendant McDaniel was aware of the conditions at ESP which caused Plaintiff's injuries, but also had a part in creating those issues because he

controlled medical care issues. (Doc. # 45 at 2.) In addition, he claims that defendant McDaniel denied an explanation to Plaintiff on May 27, 2009, as to why he had not received the recommended surgeries. (*Id*.)

Plaintiff argues that when these defendants were presented with the information from the ACLU's investigation, they should have made sure that ESP came into compliance with national standards or at least indicated that they would not tolerate medical mistreatment of inmates at ESP. (*Id*. at 3.)

Second, Plaintiff contends that he has spinal stenosis, the prison has known that this condition required surgery as early as 1998, yet no surgery was ever provided. (*Id*. at 4-6.) With respect to Defendants' argument that Plaintiff did not properly grieve this claim, Plaintiff asserts that he filed his grievance regarding the failure to provide him with surgery on May 23, 2009, which was eventually denied by defendant McDaniel, on May 27, 2009. (*Id*. at 5-6.) He asserts that he grieved this issue through the highest level, thereby exhausting his administrative remedies. (*Id*.)

Third, Plaintiff clarifies that he is not making a claim for damages for injuries which occurred before June 18, 2008. (*Id*. at 6-7.)[9] He then asserts that the date defendant Brackbill issued his memoranda regarding treatment of chronic pain is not important; rather, what is important is that he was injured by that policy within the applicable statute of limitations. (*Id*.) He makes the same argument with respect to the failure to provide him with surgery. (*Id*.)

Fourth, Plaintiff argues that neither Dr. Hellerstein, Dr. D'Amico, Dr. Bannister, nor any other prison doctor Plaintiff has seen is competent to opine on whether or not Plaintiff requires surgery. (*Id*. at 7-8.) Preliminarily, Plaintiff asserts that Defendants have not provided Plaintiff's counsel a copy of Dr. Hellerstein's report; therefore, he requests more time to respond to Dr. Hellerstein's report pursuant to Federal Rule of Civil Procedure 56(d). (*Id*. at

---

[9]It is not entirely clear what relevance the June 18, 2008 date has, since Plaintiff previously refers to May 11, 2007 as the date his claims arose, or, with respect to his claims against defendant Martin, September 11, 2008, when he was seen by defendant Martin for his physical examination.

7.) In addition, he contends that Dr. Hellerstein never examined Plaintiff and relies on incomplete and inaccurate records, offers no basis for his opinion, and is not a neurologist, neurosurgeon, or orthopedic surgeon who would be qualified to address any recommendation concerning his condition. (*Id*.) Plaintiff suggests that as a result the court may disregard the testimony of Dr. Hellerstein. (*Id*.)

Fifth, Plaintiff claims defendants Saunders and Lyons have not met their burden of showing there is no genuine dispute of material fact as to Plaintiff's retaliation claim. (*Id*. at 8-9.) He argues (for the first time) that the search of his cell was preceded by defendant Saunders making an improper advance toward Plaintiff while Plaintiff was handcuffed, on his knees, and in the shower, which Plaintiff found offensive. (*Id*.) Saunders and Lyons then trashed Plaintiff's cell and took legal documents which included the name and address of a key witness in this matter. (*Id*.) He contends that whether the trashing of Plaintiff's cell was to get back at Plaintiff for his rebuff of Saunders' improper advance or because Plaintiff filed medical grievances, it was "clearly retaliation and served no legitimate state purpose." (*Id*. at 8.) He maintains that the circumstantial evidence relating the incident in time to the grievances filed by Plaintiff establishes the requisite link between the exercise of his constitutional rights and the retaliatory action. (*Id*. at 9.)

Finally, Plaintiff contends that none of the defendants are entitled to qualified immunity because an inmate's right to see a specialist for appropriate medical treatment is well established. (*Id*. at 9-10.)

### 5. Defendants' Reply (Docs. # 147, # 148, # 149)

Preliminarily, Defendants acknowledge that Plaintiff's counsel's office contacted defense counsel on October 18, 2012, requesting copies of Dr. Hellerstein's report and Plaintiff's medical records. (Doc. # 149 at 2.) Defendants assert that Plaintiff's reply brief and opposition to Defendants' motion was due to be filed on or before October 22, 2012. (*Id*.) Defense counsel sent these materials to Plaintiff's counsel the following morning, and admits these documents are critical to Plaintiff's ability to respond to Defendants' motion, and states that to the extent

1  Plaintiff is provided an opportunity to supplement his brief, Defendants would like an

2  opportunity to file a sur-reply. (*Id.*)

3  Next, Defendants again argue that Plaintiff's reliance on the *Riker* litigation and his

4  medical history from over a decade ago is misplaced. (Doc. # 149 at 2-5.) Defendants

5  acknowledge that from 1997 through 2003, Plaintiff was seen by various health care providers,

6  including neurologists and orthopedic surgeons, for his back issues, and after undergoing

7  neurological exams, MRIs, CT scans, x-rays, and consultations, NDOC's Medical Director,

8  Dr. D'Amico, declined to refer Plaintiff to surgery on January 16, 2003. (*Id.* at 2-3.) Defendants

9  assert that Plaintiff did not grieve the January 16, 2003 denial of surgery, and therefore failed

10 to exhaust his administrative remedies as to this claim. (*Id.* at 3.)

11 Defendants then assert that in February of 2003, after the surgical referral was denied,

12 Plaintiff filed a kite for a follow-up examination with Dr. Karen Gedney, and was seen by

13 Dr. Gedney in March of 2003. (*Id.*) At that time, he was given Motrin for his back issues. (*Id.*)

14 Defendants maintain that from 2003 through the beginning of 2009, Plaintiff filed no

15 grievances or kites related to back issues, umbilical hernia, or ganglion cyst. (*Id.*)

16 On September 11, 2008, Plaintiff was seen by Nurse Martin for his annual examination,

17 and Nurse Martin documented various conditions and made recommendations for Plaintiff's

18 treatment going forward. (*Id.*)

19 On March 6, 2009, Plaintiff filed a grievance about the denial of medical care, including

20 surgery, and referenced spinal stenosis, umbilical hernia and a ganglion cyst in his right wrist.

21 (*Id.*)

22 Defendants also acknowledge that in 2007, the ACLU began investigating ESP for

23 alleged improper medical care, and that Dr. Noel was retained by the ACLU to prepare a report

24 regarding his review of various inmate records obtained by the ACLU from NDOC. (*Id.*) In

25 March of 2008, the *Riker* litigation was filed, based in part, on Dr. Noel's report. (*Id.*)

26 Defendants further admit that Dr. Noel's report referenced Plaintiff; however, Defendants

27 assert that it only referenced him to the extent he had been treated for a skin condition in 2004,

28

1  and contained no reference to Plaintiff's back issues, umbilical hernia or ganglion cyst which
2  would have put any of them on notice of the medical conditions for which Plaintiff now makes
3  his Eighth Amendment claims. (*Id*.)

4      Defendants maintain that Plaintiff is attempting to litigate the denial of surgery in 2003,
5  which they contend is barred by the statute of limitations. (*Id*.) In addition, Defendants
6  question Plaintiff's claim that defendants Gibbons, Miller and Cortez Masto, as members of the
7  Board of Prison Commissioners, were put on notice of Plaintiff's deliberately indifferent
8  medical care through Dr. Noel's report, prepared in 2007, when his claim did not accrue until
9  2008. (*Id*.) They claim that the Board of Prison Commissioners knew nothing about Plaintiff's
10 medical care and treatment after September 11, 2008. (*Id*. at 5.)

11     Defendants also argue that there is nothing in Plaintiff's medical records that
12 affirmatively stated Plaintiff must have surgery. (*Id*. at 5.)

13     Finally, they state that Plaintiff's criticisms of the opinions of Dr. Bannister, Dr. D'Amico
14 and Dr. Hellerstein are unfounded, and that Dr. Noel's examination of Plaintiff is not credible.
15 (*Id*. at 6.)

16 ## II.  LEGAL STANDARD

17     "The purpose of summary judgment is to avoid unnecessary trials when there is no
18 dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,
19 18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in
20 favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing
21 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate
22 if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that
23 there is no genuine issue as to any material fact and that the movant is entitled to judgment as
24 a matter of law." *Id*. (quoting Fed.R.Civ.P. 56(c))[10]. Where reasonable minds could differ on the

25

26     [10]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary
   judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled
27 to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

28                                                    16

material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress &*

17

1     *Co.*, 398 U.S. 144, 160 (1970).

2     If the moving party satisfies its initial burden, the burden shifts to the opposing party

3 to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

4 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

5 the opposing party need not establish a material issue of fact conclusively in its favor. It is

6 sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

7 parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

8 *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The

9 nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

10 that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions

11 and allegations of the pleadings and set forth specific facts by producing competent evidence

12 that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

13     At summary judgment, a court's function is not to weigh the evidence and determine the

14 truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

15 While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

16 drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

17 significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations

18 omitted).

## III. DISCUSSION

**A. Preliminary Matters**

    **1. Plaintiff's Opportunity to Address Dr. Hellerstein's Opinions**

    In his opposition to Defendants' motion, Plaintiff asserts that his counsel was not

provided with Dr. Hellerstein's expert report, filed in support of Defendants' motion, in time

to address it in his brief and requests an opportunity to address it under Federal Rule of Civil

Procedure 56(d). Defendants acknowledge that review of this report is critical to Plaintiff being

able to respond to Defendants' motion, and to the extent Plaintiff is afforded an opportunity

to supplement his brief to respond to Dr. Hellerstein's report, Defendants' request an

18

1    opportunity to file a sur reply.

2        Federal Rule of Civil Procedure 56(d) provides, "[i]f a nonmovant shows by affidavit or

3    declaration that, for specified reasons, it cannot present facts essential to justify its opposition,

4    the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits

5    or declarations or to take discovery; or (3) issue any other appropriate order." *See also*, *Family*

6    *Home and Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th

7    Cir. 2008) (citations omitted).

8        While Defendants state that Dr. Hellerstein's report is critical to their motion, Plaintiff

9    has not provided the court with a declaration or affidavit in support his request showing that

10   he was unable to present facts essential to his opposition to Defendants' motion. Nonetheless,

11   the court has considered Plaintiff's request, and for the reasons set forth below, finds it is

12   unnecessary to provide Plaintiff with an opportunity to address Dr. Hellerstein's motion in

13   connection with his opposition to Defendants' motion.

14       As will be set forth in detail below, the court is recommending that summary judgment

15   be granted in favor of defendants Skolnik, Gibbons, Cortez Masto and Miller because Plaintiff's

16   claim against them is based on supervisory liability and there is no evidence that they knew of

17   and disregarded a serious risk to Plaintiff's health or that they knew of and acquiesced in the

18   alleged unconstitutional conduct of others concerning the provision of health care for Plaintiff's

19   spinal stenosis. Dr. Hellerstein's report has no implication on the court's recommendation in

20   this regard since Plaintiff premises his case against these defendants on a theory of supervisory

21   liability, and Dr. Hellerstein's report concerning Plaintiff's medical condition would only

22   impact the underlying alleged constitutional deprivation.

23       Nor is Dr. Hellerstein's report relevant for purposes of evaluating Plaintiff's claim

24   against defendant Brackbill which is premised on his issuance of memoranda in 2004

25   concerning care for pain management which Plaintiff appears to assert contributed to the

26   deliberate indifference he experienced in the two years preceding the filing of this lawsuit. In

27   addition, Dr. Hellerstein's report has no relevance to Plaintiff's retaliation claim.

28

With respect to Plaintiff's Eighth Amendment claims in Count I against defendants Bannister, McDaniel and Martin related to his spinal stenosis as well as his Eighth Amendment claim in Count II against defendant Martin related to his umbilical hernia, the court finds that genuine issues of material fact exist so as to preclude the entry of summary judgment in favor of Plaintiff or Defendants; therefore, Plaintiff's request to review Dr. Hellerstein's report and supplement his response to Defendants' motion for summary judgment is moot.

Finally, with respect to Plaintiff's Eighth Amendment claim against defendant Martin related to his ganglion cyst in Count II, the court is recommending denial of Plaintiff's motion for summary judgment because he did not meet his burden. The court is recommending that defendant Martin's motion for summary judgment be granted as to this claim. Providing Plaintiff an opportunity to review and respond to Dr. Hellerstein's report would not influence the court's decision because it does not change the fact that the ganglion cyst was never referenced in Plaintiff's medical records and there is no indication (in his medical records or even in the allegations of his complaint) that Plaintiff suffered any harm as a result of the alleged delay in treating his ganglion cyst.

**2. Plaintiff's References to Other Inmates and their Injuries**

Plaintiff was not permitted to proceed with a class action and cannot assert claims on behalf of other inmates housed at ESP; therefore, the court will disregard Plaintiff's references to alleged injuries to other inmates at ESP in his motion.

**3. Time Period for Plaintiff's Claims and Plaintiff's Relevant Medical History**

The parties reference the applicable time period for Plaintiff's claims several times in their briefing. First, in his motion, Plaintiff states that the applicable time period is from May 11, 2009, when his complaint was filed, and going back two years to May 11, 2007. (Doc. # 119 at 5, 34-35.) Then, curiously, in his opposition to Defendants' motion/reply in support of his own motion, Plaintiff states that he is not making a claim for damages for injuries which occurred before June 18, 2008. (Doc. # 145 at 6-7.) At the same time, in the declaration he filed in support of his opposition, he states that he is only claiming damages for the failure to

provide him with surgery for the two years before he filed suit. (Doc. # 150 at 2 ¶ 7.)

Defendants make the argument several times that Plaintiff's medical history going back into the 1990's is not relevant to Plaintiff's claims, which Plaintiff admits arose two years preceding the filing of his lawsuit, and Defendants assert arose on September 11, 2008. (*See* Doc. # 130 at 18-21, 29-30.) Defendants argue that Plaintiff's claim relating to a denial of back surgery is barred by the applicable statute of limitations because the denial of surgery occurred in January of 2003. (Doc. # 130 at 18-21.) In addition, defendant Brackbill argues that to the extent he is named in Plaintiff's action due to the issuance of certain memoranda in 2004, Plaintiff's claim against him is barred by the statute of limitations. (Doc. # 130 at 21.)

Section 1983 does not contain its own statute of limitations. Therefore, the federal courts borrow the statute of limitations for § 1983 claims applicable to personal injury claims. *Wilson v.  Garcia*, 471 U.S. 261, 279-80 (1985); *Johnson v. State of California*, 207 F.3d 650, 653 (9ᵗʰ Cir. 2000)(citation omitted). Therefore, the two-year statute of limitations for personal injury actions in Nevada is applicable to § 1983 claims. Nev.  Rev.  Stat. § 11.190(4)(e); *Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989).  Under federal law, a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Bagley v. CMC Real Estate Corp*., 923 F.2d 758, 760 (9th Cir.  1991).

First, the court finds that Plaintiff's medical history going back to the 1990's may be relevant to show that Defendants had knowledge of Plaintiff's medical condition and were deliberately indifferent in their treatment of Plaintiff during the applicable limitations period.

Second, with respect to his claim in Count I, Plaintiff has made clear that he is not filing a complaint for damages resulting from the denial of back surgery in 2003. That piece of his medical history is relevant because it shows what the Defendants may have had knowledge of when they allegedly denied him care or treatment for his spinal stenosis during the applicable statute of limitations period. The court agrees with Plaintiff that he may seek damages to the extent he can establish Defendants were deliberately indifferent when they continued to deny him surgery for his spinal stenosis during the applicable statute of limitations period.

1    Finally, Plaintiff's claims in Count II against defendant Martin arose, by Plaintiff's own

2    allegations, starting with a specific visit on September 11, 2008. Thus, that is the date Plaintiff's

3    claim against Dr. Martin accrued for purposes of this action.

4    **4. Exhaustion of Administrative Remedies**

5    Defendants argue, that Plaintiff improperly seeks to place his medical care and

6    treatment prior to September 11, 2008, at issue because he did not exhaust his administrative

7    remedies with respect to an alleged denial of back surgery in January 2003. (Doc. # 130 at 18-

8    21.) As indicated above, Plaintiff is not claiming damages related to the denial of back surgery

9    in 2003; rather, he seeks to prove deliberate indifference related, in part, to the continual

10   denial of back surgery during the relevant statute of limitations period. Accordingly, he was not

11   required to exhaust his administrative remedies for the 2003 back surgery denial in order to

12   file this litigation. It is sufficient that he exhausted his administrative remedies with respect to

13   the claims in this action, and his grievances doing so included reference to the failure to provide

14   him with treatment, including surgery, to correct his spinal stenosis.

15   **B. Eighth Amendment Deliberate Indifference to Serious Medical Need**

16   **1. Legal Standard**

17   A prisoner can establish an Eighth Amendment violation arising from deficient medical

18   care if he can prove that prison officials were deliberately indifferent to a serious medical need.

19   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

20   stringent in cases involving a prisoner's medical needs than in other cases involving harm to

21   incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

22   care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

23   974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

24   F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

25   inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

26   or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

27   A finding of deliberate indifference involves the examination of two elements: "the

28   22

seriousness of the prisoner's medical need and the nature of the defendant's responses to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id*. at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511

23

U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

In addition, "[a] difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). To establish deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Finally, where the applicable constitutional standard is deliberate indifference, as it is here, "a plaintiff may state a claim against a supervisor...based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2102 (2012). Thus, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Id.* at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish the necessary causal connection for supervisory liability by alleging that the defendant "set[ ] in motion a series of acts by others" or "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (internal quotations, alterations and citations omitted). Thus, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the

training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

**2. Analysis**

**I. Defendants Gibbons, Miller, Cortez Masto and Skolnik**

The court finds that Plaintiff's motion for summary judgment should be denied insofar as he claims that these defendants violated his Eighth Amendment rights in connection with his serious medical needs. Instead, summary judgment should be granted in favor of defendants Gibbons, Miller, Cortex Masto and Skolnik with respect to Plaintiff's Eighth Amendment claim in Count I.

Plaintiff premises his claim against these defendants on the fact that they gained knowledge of his medical condition through: (1) the ACLU's investigation and Dr. Noel's report which was provided to them in 2008; (2) legislative discussions concerning the provision of health care at ESP; (3) discussions about the ACLU's investigation and proposed consent decree at a Board of Prison Commissioners meeting where defendants Gibbons, Miller and Cortez Masto were members of the board; and (4) through various news articles concerning the provision of health care at ESP. Plaintiff presents a multitude of exhibits that he claims support his theory of liability against these defendants. The court has carefully reviewed all of the exhibits provided by Plaintiff in support of his motion and in support of his opposition/reply brief, and will discuss them in turn below; however, the court finds that none of the evidence submitted by Plaintiff demonstrates that any of these defendants themselves knew of and disregarded an excessive risk to Plaintiff's health or that they knew of and acquiesced in the unconstitutional conduct of others insofar as the allegations of deliberate indifference to his spinal stenosis are concerned.

The court will now address the evidence submitted by Plaintiff in support of his motion for summary judgment.

///

25

### a. Summary of Evidence

### 1. ACLU Investigation

First, Plaintiff submits various documents related to the ACLU's investigation, unsuccessful negotiations with NDOC, and factual history which led to the filing of the *Riker* litigation. The court will now summarize those materials. Plaintiff provides most of the referenced documents as separate exhibits, but also includes a declaration by Amy Fettig, staff counsel for the ACLU, submitted in connection with the *Riker* litigation, which also provides a detailed history of these events. (Pl.'s Ex. 3-O, Doc. # 119-1 at 151-159, Doc. # 119-2 at 1-8.) The court will therefore reference both the Fettig declaration and the separate exhibits, where applicable, in providing its summary and analysis of Plaintiff's evidence.

Plaintiff's Exhibit 1-A (Doc. # 119-1 at 61-95) is the Legislative Counsel Bureau bulletin for the Legislative Commission's Subcommittee to Study Sentencing and Pardons, and Parole and Probation, dated January 2007. (*Id.* at 61.) The bulletin contains a subcommittee report referencing issues concerning NDOC. (*Id.* at 76.) The bulletin notes that one issue brought to the subcommittee was "that inmates with health problems may not be receiving prompt and adequate treatment." (*Id.*) The subcommittee responded by drafting letters to the Legislative Commission and to the Governor requesting an evaluation of inmate access to health care. (*Id.* at 76, 91-92, 93.)

The ACLU began investigating medical care at ESP in January of 2007. (Pl.'s Ex. 3-0, Fettig Decl., Doc. # 119-1 at 153 ¶ 8.) The ACLU's involvement stemmed from notification from their Nevada office of complaints concerning health care at ESP received in their intake department, the Legislative Subcommittee hearing and subsequent requests to the Governor to evaluate prisoner access to medical care, and communications from the Federal Public Defender's Office (FPD) regarding its own investigation into medical care at ESP for its clients. (*Id.* at 153-154 ¶ 9.) The FPD secured releases from its clients and was able to share medical records and other medical documentation with the ACLU. (*See id.* at 154 ¶¶ 10-11.) At the time their investigation began, ESP had no full-time doctor on staff other than a staff psychiatrist.

26

(*Id*. at 155 ¶ 12.)

Ms. Fettig visited ESP on May 7-8, 2007, and interviewed seven death row prisoners regarding their medical treatment, as well as former nurse, Lorraine Memory. (*Id*. at 157 ¶ 17.) She determined that four of these prisoners (not Plaintiff) needed immediate medical intervention, and contacted Director Skolnik outlining the ACLU's concerns. (*Id*. at 157-158 ¶¶ 17-18; a copy of this letter is set forth at Pl.'s Ex. 1-J, Doc. # 119-2 at 60-62.) On May 17, 2007, Director Skolnik sent back a response written by Dr. Bannister indicating that he "had confidence in the skills of the Physician Assistant's handling of medical care at ESP[,] [b]ut that he had asked for a review of these prisoners' medical treatment." (*Id*. at 158 ¶ 19; a copy of the letter is set forth at Pl.'s Ex. 1-K, Doc. # 119-2 at 43.)

Then, the ACLU identified and retained Dr. William Noel to review ESP medical records and apply the appropriate communicate standard of care. (*Id*. ¶ 20.)

Ms. Fettig traveled to Nevada again to meet with Director Skolnik to discuss their concerns regarding the medical care being provided at ESP. (*Id*. at 159 ¶ 21.) Skolnik agreed to allow the ACLU to photocopy certain medical records from prisoners who had signed releases and to allow their medical expert to tour ESP and interview prisoners and staff about the care being given. (*Id*. at ¶¶ 21-22; *see also* correspondence between the ACLU and defendant Skolnik dated June 29, 2007, set forth at Pl.'s Ex. 1-M, Doc. # 119-3 at 67-68.)

On September 25, 2007, Ms. Fettig informed Director Skolnik that Dr. Noel had reviewed the records of thirty-five inmates at ESP, and notified him of the alarming nature of the results of his review, and that the records maintenance fell below community standards. (Doc. # 119-2 at 1 ¶ 24; a copy of this letter is set forth at Pl.'s Ex. 1-O, Doc. # 119-2 at 80-85.) The letter had an enclosure which described some of the inmates at ESP who required immediate medical attention (this list did not include Plaintiff). (*Id*.)

Then, on October 8-9, 2007, Dr. Noel and Ms. Fettig visited ESP, and met with Dr. Bannister to review a list of urgent cases, interviewed prisoners, reviewed medical records, toured the infirmary and spoke with medical staff. (Doc. # 119-2 at 1 ¶ 25.) On December 5,

2007, the ACLU sent Director Skolnik Dr. Noel's full report. (*Id.* 1-3 ¶¶ 26-28; the letter is set forth Pl.'s Ex. 1-P, Doc. # 119-2 at 88-90 .) It was copied to Attorney General Cortez Masto. (Doc. # 119-2 at 90.) The letter sending Director Skolnik the report also informed him that when they went to ESP and met with Dr. Bannister, he had agreed with many of Dr. Noel's treatment recommendations for the urgent cases but had received no reassurances that they were implemented. (Doc. # 119-2 at 3 ¶ 29.) The ACLU suggested a meeting between it, Director Skolnik, and the Governor. (*Id.* at 4 ¶ 30.) The ACLU sent a similar request to the Governor's Office, providing a copy of the Noel report, and copying Attorney General Catherine Cortez Masto. (*Id.* ¶ 31; Pl.'s Ex. 1-R, Doc. # 119-1 at 13-14.)[11]

Plaintiff's Exhibit 1-Z (Doc. # 119-1 at 17-57)[12] is Dr. Noel's November 2, 2007 report prepared for the ACLU. According to Dr. Noel, "[a]t the request of the National Prison Project of the American Civil Liberties [Union], [he] reviewed the medical records of thirty-five prisoners from Ely State Prison (ESP) in Ely, Nevada." (*Id.* at 17.) In addition, "[o]n October 8-9, 2007, at the request of the Nevada Department of Corrections, I traveled to the prison to discuss my findings with the Department's Medical Director, Dr. Robert Bannister." (*Id.* at 17.) He discussed his findings with Dr. Bannister, particularly "those concerning the most urgent cases I had reviewed." (*Id.*) Dr. Noel's report contains his opinion that "the medical care provided at Ely State Prison amounts to the grossest possible medical malpractice, and the most shocking and callous disregard for human life and human suffering, that I have ever encountered in the medical profession in my thirty-five years of practice." (*Id.* at 17, 19.) He goes on to provide a summary of his findings with respect to the individual cases he reviewed. (*Id.* at 19.) Dr. Noel places the summaries of the inmates he reviewed into three categories: "I. Grossly Callous Denial of Basic Medical Care Resulting in Agonizing Pain, Injury and High

---

[11]While this letter is dated December 6, 2005, the court assumes this is a typographical error since it references Dr. Noel's report, which was created in 2007, and Ms. Fettig herself states that the ACLU did not begin its investigation into ESP until 2007.

[12]The report is printed on every other page.

Risk of Premature Death" (*id.* at 19-41); "II. Grossly Inappropriate and Inadequate Medical Care" (*id.* at 41-49); and "III. Unprofessional Conduct and Grossly Improper Medical Charting Practices" (*id.* at 49-56). The summary related to Plaintiff is contained within the third category. (*Id.* at 53.) Dr. Noel's report states that the records reviewed in this category "were often too illegible to discern the type of care being provided or too sparse to know if the patient has significant health concerns[;]" however, he provides a "brief overview of [his] concern with these records." (*Id.* at 49.) Dr. Noel states the following as it relates to Plaintiff:

> **Dennis McCabe** has had several surgeries, and has suffered stab wounds. He is chronically anemic. He had three consults in 2004 for erythemia multiformi (large red raised areas that are related to allergy and autoimmune disorders). There are, however, no consult reports in his chart. Mr. McCabe was on vistaril (an antihistamine type drug used as calmative and for allergies) long-term for his erythema multiforma. The medication appeared to work but the record shows that the prison doctor refused to give vistaril to Mr. McCabe, stating that he "doesn't believe in it." Mr. McCabe is now on prednisone for his erythema multiformi. Prednisone has serious side effects and therefore patients on the drug must be monitored.
>
> All or Mr. McCabe's lab reports before 2003 are unreadable. There are no progress notes in his chart after 2006.

(*Id.* at 53.)

After attempting to negotiate with NDOC for months, the ACLU then sent Director Skolnik a draft consent decree. (Doc. # 119-2 at 4-5 ¶¶32-33; *see also* Pl.'s Ex. 1-S, Doc. # 119-2 at 94-95 .) The Board of State Prison Commissioners rejected the offer to enter into a consent decree. (Doc. # 119-2 at 6 ¶ 35; the letter from defendant Skolnik informing the ACLU that the board voted not to accept the consent decree is set forth at Pl.'s Ex. 1-U, Doc. # 119-2 at 98.) In addition, NDOC provided a response to Dr. Noel's report authored by Dr. Bannister. (Doc. # 119-2 at 6 ¶ 35.) After further attempts to negotiate regarding the medical care at ESP, the ACLU filed the *Riker* action, on March 6, 2008. (*Id.* at 6 ¶ 36.)

## 2. Documents Filed In Other Actions Re: Alleged Deficiencies at ESP

Next, Plaintiff provides various documents filed in other actions related asserted deficiencies in the provision of health care at ESP. For example, Plaintiff's Exhibit 1-B (Doc. #

119-1 at 99-144) is a copy of a motion for relief filed in *Lisle v. McDaniel*, CV-S-03-1005-JCM-LRL, where Lisle's Federal Public Defender moved for an order enjoining deliberate indifference concerning his health care at ESP. This exhibit includes a declaration by a former nurse at ESP, Lorraine Memory. (Doc. # 119-1 at 132-144.)[13] The declaration includes a statement that defendant McDaniel told a doctor who at ESP (who is not named a defendant in this action) that he should not save the lives of death row inmates, and he and defendant Brackbill overruled medical decisions made by ESP medical personnel. (*Id*. at 134, 138.) Her declaration contains many other statements regarding the conduct of this doctor at ESP who is not named a defendant herein. She also states that inmates at ESP did not receive annual physical examinations, and that ESP did not have a working x-ray machine for a period of more than six months. (*Id*. at 133-34, 136.) Another declaration of Ms. Memory is set forth in Plaintiff's Exhibit 1-E (Doc. # 119-2 at 34-36.) In this declaration, she states that inmates at ESP sometimes go six weeks without their medication, and that it was common for inmates to run out of medication. (*Id*.)

Exhibit 1-F (Doc. # 119-2 at 40-43) contains the declaration of Jewel Jacques, R.N., who was a nurse at ESP. Her declaration contains her opinion that defendant Brackbill was not qualified for his position, and that he let the warden interfere with medical decisions. (*Id*.)

Exhibit 1-G (Doc. # 119-2 at 46-50) is the declaration of Steven Smith, who was a licensed practice nurse at ESP. He states that there was no physician at ESP, and comments on the poor quality of the medical charting practices at ESP. (*Id*.) He also stated that it would sometimes take two to three weeks for medication to be ordered. (*Id*.)

### 3. News Articles and Press Release

Plaintiff also submitted various news articles and a press release concerning medical care at ESP, asserting that these items put the defendants on notice as to the poor quality of care at ESP. Exhibit 3-F (Doc. # 119-2 at 12-16), is an article from the Las Vegas Review

---

[13]This declaration appears to be duplicated in Plaintiff's Exhibit 1-D (Doc. # 119-2 at 20-31), and is also referenced in Ms. Fettig's declaration.

Journal, dated March 6, 2008: "Ely State Prison: Lawsuit to be filed over inmate care. ACLU alleges state fails to give adequate relief." The article contains a comment by defendant Skolnik, "The medical care at Ely does meet constitutional standards. Ely is a prison. It is not a hospital. The operations of an infirmary at a prison are different than working in a hospital." (*Id.*) Defendant Skolnik is also reported as commenting that a full-time doctor was hired by the prison, and the facility was being staffed at all hours by nurses, as well as two doctors and a physician's assistant on staff. (*Id.*)

Exhibit 3-E is a press release from the ACLU dated March 6, 2008, concerning the lawsuit filed against ESP. (Pl.'s Ex. 3-E, Doc. # 119-2 at 54-56.)

Exhibit 3-N is an article from the Las Vegas Tribune: "Death at Ely Prison Concerns Inmates-Contaminated Food and Drink Tampering Suspected at Ely State Prison." (Pl.'s Ex. 3-N, Doc. # 119-2 at 70.) The article mentions fifty-six inmates complaining of finding foreign objects in their food. (*Id.*)

Exhibit 3-W (Doc. # 119-2 at 74-76) is an article from the Los Angeles Times dated December 6, 2007: "Poor medical care cited at Nevada prison."

Finally, Exhibit 3-L is an article from the Ely Times dated August 22, 2007, which states that Governor Gibbons toured ESP for the first time that month. (Pl.'s Ex. 3-L, Doc. # 119-3 at 124-126.)

### b. Conclusion

While these documents present alarming accusations, allegations, as well as the proffered findings of Dr. Noel regarding the provision of health care at ESP at that time, they do not provide evidence that former Governor Gibbons, Attorney General Cortez Masto, Secretary of State Ross Miller, or former Director Skolnik knew of and disregarded the particular risks to *Plaintiff's health* that are the subject of *this* action—Plaintiff's medical care relative to his spinal stenosis—or that they knew of and acquiesced in the constitutional violations of others.

First, it is undisputed that the legislative subcommittee sent a letter to the Governor's

31

Office recommending that an evaluation of access to health care be performed. However, nothing in the legislative subcommittee's bulletin or the letter sent to the Governor's Office makes specific reference to Plaintiff or his health care condition so as to provide Governor Gibbons with notice of asserted constitutional deprivations concerning Plaintiff's care and treatment for spinal stenosis at ESP.

Second, even assuming that these Defendants all received the communications from the ACLU referenced by Plaintiff, as well as Dr. Noel's report, the court cannot conclude that these communications provided these defendants with knowledge of an alleged Eighth Amendment violation taking place at ESP concerning Plaintiff's care and treatment relative to his spinal stenosis. None of the ACLU communications make specific reference to Plaintiff or his health condition. While Plaintiff is referenced in Dr. Noel's report, the report contains  no mention of the medical conditions that are the subject of his Eighth Amendment claim against these defendants in this action, *i.e.*, spinal stenosis or, or even back problems generally. Nor does the report make reference to a denial of pain medication to Plaintiff for chronic pain resulting from his back issues.

Third, while defendants Gibbons, Cortez Masto and Miller were undeniably members of the Board of Prison Commissioners that voted against accepting the ACLU's consent decree, the minutes from that board meeting do not reflect any specific mention of Plaintiff or his medical condition which would have provided these defendants with knowledge of the alleged Eighth Amendment violation taking place at ESP concerning Plaintiff's spinal stenosis.

Fourth, Plaintiff has provided the declarations of various former employees of ESP, filed in connection with other prisoner civil rights actions; however, not one of these declarations mentions Plaintiff or his health care condition.

Finally, the news articles and press release presented by Plaintiff similarly fail to establish that these defendants knew of and disregarded a serious threat to Plaintiff's health related to his spinal stenosis.

The fact that these defendants may have been presented with general information

concerning alleged deficiencies in the health care system at ESP or with specific information about deficiencies concerning other inmates at ESP does not lead to the conclusion, or even raise a genuine issue of material fact, as to whether they were deliberately indifferent to Plaintiff's serious medical needs in this action—which he has alleged is the failure to properly treat his spinal stenosis—by their own conduct or by acquiescing in the unconstitutional conduct of others.

In sum, Plaintiff has not met his burden on summary judgment as to these defendants. These defendants, on the other hand, have established that Plaintiff cannot maintain a supervisory claim against them under the Eighth Amendment because he cannot demonstrate that the knew of and acquiesced in the alleged constitutional violation. Therefore, the court recommends that Plaintiff's motion for summary judgment be denied in this regard, and that summary judgment be granted in favor of defendants Gibbons, Miller, Cortez Masto, and Skolnik as to Plaintiff's Eighth Amendment claim against them in Count I.

### ii. Defendant Brackbill

Plaintiff's Exhibit 1-C (Doc. # 119-1 at 147-48) is a series of memoranda issued by defendant Brackbill to ESP inmates, on June 29, 2004 and July 1, 2004, regarding pain medication. The first memorandum states:

> EFFECTIVE BEGINNING JULY 5, 2004, PER DR. D'AMICO MEDICAL DIRECTOR, WE WILL NO LONGER TREAT LONG-TERM CHRONIC PAIN ON A ROUTINE BASIS. PAIN WILL BE TREATED ONLY ON AN ACUTE, SHORT-TERM BASIS. THIS MEANS, IF YOU HAVE AN [SIC] RECENT INJURY, DENTAL EXTRACTION OR AN INCIDENT OF PAIN REQUIRING SOME PAIN INTERVENTION, YOU WILL BE TREATED FOR A PERIOD OF 3-4 DAYS AVERAGE, BUT NOT MORE THAN 14 DAYS. SHORT-TERM TREATMENT, 3-4 DAYS, WILL BE KOP'D TO YOU. TREATMENT OF 5 TO 14 DAYS WILL BE PLACED ON PILL-CALL. IF YOU REFUSE TO TAKE YOUR PILL-CALL MEDS FOR MORE THAN 3 DOSES, THIS MEDICATION WILL BE DISCONTINUED.
>
> NO LONG-TERM TREATMENT WILL BE AVAILABLE, UNLESS DOCTOR DEEMS SUCH TREATMENT NECESSARY. THIS TYPE OF TREATMENT WILL BE ASSESSED ON AN INDIVIDUAL BASIS AND MAY REQUIRE ADMISSION TO THE INFIRMARY FOR THIS TYPE OF TREATMENT. LONG TERM USE OF MEDICATIONS FOR PAIN CAN RESULT IN SEVERE STOMACH DAMAGE, WHICH FAR OUTWEIGHS THE RISK TO ONE'S HEALTH COMPARED TO DEALING WITH DAILY ACHES AND PAIN.

(*Id.* at 147.)

33

The second memorandum, provides reasoning to support the first, and states, in pertinent part:

1.

LONG-TERM USE OF PAIN MEDICATIONS, SUCH AS MOTRIN, INDOCIN, MAPROXYEN, AND OTHERS, CAN RESULT IN CHRONIC STOMACH DISORDER AND STOMACH BLEEDING. TREATMENT OF SHORT-TERM PAIN WILL STILL BE AVAILABLE FOR INJURY, ACUTE PAIN AND DISCOMFORT. HOWEVER, THIS WILL BE AVAILABLE ONLY FOR A PERIOD NOT TO EXCEED 14 DAYS. PAIN MEDS ORDERED FOR 3-4 DAYS WILL BE KOP'D. MEDS ORDER [SIC] FOR MORE THAN 4 DAYS WILL BE PLACED ON PILL-CALL. REFUSAL OF MORE THAN 3 DOSES ORDERED WILL RESULT IN THE MEDICATION BEING DISCONTINUED.

IF YOU FEEL YOU NEED MEDICATIONS FOR YOUR PAIN OUTSIDE THESE GUIDELINES, MOTRIN IS AVAILABLE FOR PURCHASE IN THE INMATE STORE.

2.
THIS ISSUE IS ALSO RELATED TO THE CHRONIC PRACTICE OF USING THE ABOVE MEDICATION AS A TOOL, OF TRADING AND PURCHASING GOODS AND SERVICES AMONG THE INMATE POPULATION. WHILE ALL KNOW THIS PRACTICE IS AGAINST REGULATIONS, IT WAS AN ACTIVE BEHAVIOR IN ALL INSTITUTIONS.

(*Id*. at 148.)

The court agrees with Plaintiff that he could present a claim against defendant Brackbill based upon the issuance of this policy in 2004; however, this is predicated on Plaintiff being able to show that the alleged deliberate indifference he suffered between 2007 and 2009 was caused, at least in part, by the issuance of this policy. In that respect, the court finds that Plaintiff has not made the latter showing. He has not made an evidentiary connection between the issuance of this pain management policy by defendant Brackbill in 2004, and the alleged deliberate indifference concerning his spinal stenosis that allegedly occurred between 2007 and 2009. Therefore, Plaintiff has not met his burden of establishing he is entitled to summary judgment against defendant Brackbill, and in the absence of such evidence, summary judgment should be granted in defendant Brackbill's favor.

### iii. Defendants Bannister, Martin, and McDaniel

Preliminarily, the court points out that to the extent Plaintiff's theory of liability against

34

defendants McDaniel and Bannister is premised on supervisory liability related to their receipt of information in connection with the ACLU investigation as described above, Plaintiff cannot proceed with his case against McDaniel or Bannister because of the court's finding that information did not provide the defendants with knowledge of alleged deficiencies in the provision of health care specific to Plaintiff's allegations of deliberate indifference in this action. In addition, to the extent Plaintiff bases his theory of liability against defendant McDaniel on a broad assertion that McDaniel interfered with medical decisions at ESP, he has not provided evidence that McDaniel interfered in a specific medical decision related to Plaintiff's care at ESP; therefore, this theory of liability also fails.

Plaintiff, however, has another theory of liability against defendants McDaniel and Bannister which is based on their receipt of information concerning the alleged deficiencies in Plaintiff's health care through the grievance process, and subsequent denial of his grievances.

Plaintiff's theory of liability against defendant Martin is directly related to Martin's treatment (or alleged lack thereof) of Plaintiff's medical conditions.

### a. Spinal Stenosis

It is undisputed that Plaintiff was diagnosed with spinal stenosis, that surgery was recommended at one point and denied by Dr. D'Amico/the Utilization Review Panel in 2003, and that Plaintiff suffered pain caused by this condition. (*See* Dr. Hellerstein's opinions at Defs.' Ex. D, Attachment 3, Doc. # 133-1 at 14-18; Pl.'s medical records, transcribed by Karen Scofield at Doc. # 133-2 at 4-5 ¶ 11.) It is also undisputed that in September of 2008, Plaintiff saw defendant Martin for his annual physical examination. (*See* Doc. # 133-1 at 18; ; Pl.'s medical records, transcribed by Karen Scofield at Doc. # 133-2 at 4-5 ¶ 11.) At that time, defendant Martin assessed Plaintiff as having a history of chronic low back pain, spinal stenosis among other unrelated medical conditions. (Doc. # 133-2 at 4 ¶ 11.) A lumbar x-ray was ordered, as well as an ibuprofen pain pack, and Plaintiff was to return to the clinic in two weeks. (*Id.* at 5.) Plaintiff asserts that while defendant Martin ordered x-rays and ibuprofen, and promised to provide treatment for spinal stenosis, none of these things was forthcoming.

This is corroborated by his kite dated April 8, 2009. (Doc. # 133-2 at 1, 56.)

Defendants on the other hand, state that lumbar spine x-rays were ordered, and there was an order to continue Plaintiff on ibuprofen, as well as a two-week follow up. (Doc. # 133-1 at 18.) Dr. Hellerstein notes that there is no progress note documentation regarding a follow up, but there is an order for medication and laboratory studies 13 days later. (Doc. # 133-1 1 at 18.) It does not state whether these things occurred, but only states that Plaintiff was not seen again until the following year in June. (*Id*.)

It is also undisputed that Plaintiff filed a grievance related to his medical care in March of 2009. (Doc. # 133-1 at 18; Doc. # 132-1 at 52-67.) In the informal level grievance, Plaintiff stated: "I need to find out why I have been denied medical treatment, care, surgery for the following: spinal stenosis, umbilical hernia, ganglion cist [sic] right wrist." (Doc. # 132-1 at 52.) Plaintiff stated that he had been experiencing this problem for seven years. (*Id*.) He claims that he asked for treatment for spinal stenosis ninety days before he filed the grievance, and defendant Martin examined his back and said he was aware of the problem, and would order x-rays and medication but nothing ever happened. (*Id*. at 53.) He relayed portions of his medical history, including reference to the surgical referral, and stated that no one had done anything for the constant pain he was experiencing. (*Id*. at 54.) The informal level grievance was denied by Nurse Murphy, stating: "You have not kited us about these issues in 6 months. If you feel you need follow-up or additional medical care you need to kite for an appointment." (*Id*. at 52.)

Plaintiff then filed a first level grievance. (Doc. # 132-1 at 59-60.) Plaintiff stated that he went to his physical on September 11, 2009, and requested treatment for the pain of spinal stenosis (as well as for his umbilical hernia and ganglion cyst), and was told he would receive treatment and medication for these medical problems, but did not. (*Id*.) Defendant McDaniel provided the response to the first level grievance, stating: "Optometry consult sent, labs ordered and done, x-ray pending return of service (scheduled non-emergent). Pain medication ordered and filled." (*Id*.)

Plaintiff filed a second level grievance, stating that the optometry and lab work referenced in the first level response had nothing to do with his grievance. (Doc. # 132-1 at 62-65.) He also states that he did not understand the reference to the x-rays in the first level response and whether that addressed his grievance. (*Id*.) He stated that no x-rays were performed, nor were they necessarily needed because MRIs and other tests already revealed he had spinal stenosis and he needed surgery to correct this condition. (*Id*. at 62-63.) He also states that his pain medication was not ordered and filled. (*Id*. at 63.)

Dr. Bannister responded to Plaintiff's second level grievance, stating only that he agreed with the response given at the first level. (Doc. # 132-1 at 66.)

In addition, Defendants do not dispute that Plaintiff subsequently filed at least two kites related to his back, with the first asking about x-rays that were supposed to have been ordered but were not and about the results of lab work. (Doc. # 133-1 at 18.) Defendants acknowledge that the response to the kite discussed the results of the lab work but did not address Plaintiff's question about the x-rays. (*Id*.) Plaintiff subsequently filed a kite requesting medication for spinal stenosis, and a follow up was ordered. (*Id*.) The x-ray order was discontinued without explanation. (*Id*.)

Defendant McDaniel argues that he was the warden, and not a member of the medical team at ESP, and therefore, he made no decisions with respect to Plaintiff's health care. (McDaniel Decl., Ex. B to Defs.' Mtn, ¶¶ 9-16.) However, if McDaniel received information in Plaintiff's grievances which alerted him to deliberate indifference by other ESP employees concerning Plaintiff's medical care, and did nothing to remedy the situation, this falls squarely within the "knowledge and acquiescence" theory of liability discussed in *Starr v. Baca*. Plaintiff's grievance, which defendant McDaniel received and prepared a response to, specifically asked why he had been denied medical treatment and care, including surgery, for his spinal stenosis. (Doc. # 132-1 at 52-53.) Plaintiff provided a description of his medical history, and stated that no one had done anything for the constant pain he was experiencing. (*Id*.) Moreover, if defendant McDaniel could not make *any* determination relative to Plaintiff,

1    it is not clear why he was assigned to respond to Plaintiff's grievance which clearly related to

2    Plaintiff's health care.  Thus, simply because defendant McDaniel was not a member of the

3    medical team at ESP does not relieve him of liability. Accordingly, defendant McDaniel's

4    motion for summary judgment cannot be granted on this basis.

5          Dr. Hellerstein opines that while there were delays in the provision of medical treatment

6    to Plaintiff concerning his spinal stenosis, Plaintiff contributed to them by refusing or failing

7    to show for scheduled appointments and examinations. (Defs.' Ex. D, Attachment 3, Doc. #

8    133-1 at 14.) It is Dr. Hellerstein's opinion that spinal stenosis is "usually managed non-

9    surgically over a period of time pending a decision whether or not to operate[;]" therefore, any

10   delay in providing Plaintiff with treatment was acceptable under the circumstances. (*Id.*) While

11   he concedes that Plaintiff's "pain caused by this condition might have been lessened or avoided

12   had he been treated surgically. Nevertheless, it is [his] opinion that the decision to treat

13   Mr. McCabe's spinal stenosis conservatively without surgery was medically acceptable under

14   the circumstances at the time, and did not involve an excessive risk to Plaintiff's health." (*Id.*,

15   23.)

16         Dr. Noel, on the other hand, opines that surgical intervention is necessary to treat spinal

17   stenosis to stop the progress of the disease which causes pain, loss of sensation, parasthesias,

18   and loss of muscular function, and should be done as early as possible to ensure at least some

19   recovery of lost functions. (Doc. # 119-2 at 156-160.) He says that specialists have been

20   recommending surgical intervention for Plaintiff for his spinal stenosis since the mid to late

21   1990s, and delaying action for this long is unconscionable. (*Id.*)

22         The court concludes that genuine issues of material fact exist precluding the entry of

23   summary judgment in favor of Plaintiff or Defendants on the issue of whether defendants

24   Bannister, McDaniel and Martin were deliberately indifferent in their provision of care related

25   to Plaintiff's spinal stenosis. While a difference of opinion may exist concerning whether the

26   treatment afforded Plaintiff constitutes deliberate indifference, material factual issues exist as

27   to whether the course of conduct taken by Defendants was medically acceptable under the

28

circumstances. Dr. Hellerstein is of the opinion that Defendants "conservative" course of treatment of Plaintiff's spinal stenosis was medically acceptable and that treatment of spinal stenosis does not require surgical intervention. Dr. Noel, on the other hand, asserts that spinal stenosis requires early surgical intervention to relieve pain and restore functionality.

There are also open questions left unanswered by the parties' briefs concerning what medication Plaintiff was actually prescribed and received for his spinal stenosis and whether this provided him any relief. A jury should determine these questions as well as whether Defendants were deliberately indifferent when they failed to intervene and provide Plaintiff with any further treatment in the face of medical records diagnosing him with spinal stenosis and recommending surgical intervention in the past. *See Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012) (finding that while the defendants may have presented a difference of opinion, there were factual issues for the jury to determine whether a denial of recommendation of surgery was medically acceptable under the circumstances).

### b. Umbilical hernia

The court will now address Plaintiff's Eighth Amendment claim as it relates to his umbilical hernia, which is directed only to defendant Martin in Count II.

Defendants' expert states that the first reference to an umbilical hernia in Plaintiff's medical records occurs in September of 2008, when a "1 inch reducible umbilical hernia" was noted. (Doc. # 133-1 at 24.) Plaintiff was provided with an abdominal binder. (*Id*.) Dr. Hellerstein states that "current recommendations are to repair incisional and umbilical hernias of the size of Mr. McCabe's hernia, if there are no contraindications to the surgery." (*Id*.) He opines, however, that Plaintiff "was asymptomatic, the complications of incarceration and potential strangulation are not inevitable, and Mr. McCabe is in a protected environment where medical care is promptly available to him should such a complication develop."[14] (*Id*.)

---

[14]According to Dr. Hellerstein: "A hernia results from a break or defect in the connective tissue that lies between the abdominal contents and the fact and subcutaneous tissue of the abdominal wall. Loops of bowel can slip through this defect and can be palpated as a lump. Often such hernias are asymptomatic and can be 'reduced' by applying gentle pressure on the overlying skin, pushing the loops of bowel back through the defect and into the

His ultimate conclusion is that failure to repair the hernia surgically did not expose Plaintiff to a substantial risk of harm. (*Id.*)

Plaintiff, on the other hand, contends that subsequent to his visit with defendant Martin, in 2010, he was transported to an outside hospital for treatment for gallstones, and the physician providing his care told him that he had an umbilical hernia that required surgical repair. (Doc. # 25 at 16, 27-28.)

It is undisputed that defendant Martin assessed Plaintiff as having a one-inch reducible umbilical hernia when he was seen on September 11, 2008. (Doc. # 133-2 at 4.) Defendant Martin ordered that Plaintiff get abdominal support for his hernia. (*Id.* at 5.) It is not clear whether or not Plaintiff ever received the abdominal support, and if he did, whether it provided any relief. Defendants also do not address Plaintiff's contention that a physician subsequently told him that the umbilical hernia required surgical intervention.

As a result, the court finds that both Plaintiff's and defendant Martin's motions for summary judgment should be denied as to the Eighth Amendment claim related to Plaintiff's umbilical hernia because of the existence of genuine issues of material fact as to whether the delay in providing treatment resulted in harm to Plaintiff and/or whether the decision not to treat the umbilical hernia surgically was medically unacceptable under the circumstances. A jury believing Plaintiff's version of events could determine that he suffered additional harm because of the failure to treat the umbilical hernia surgically. While Defendants contend this is simply a matter of a difference of opinion, a jury believing Plaintiff's version of events could determine this decision was medically unacceptable under the circumstances. On the other hand, a jury believing defendant Martin's testimony, and crediting the testimony of Dr. Hellerstein, could determine that Plaintiff did not suffer any further harm and therefore,

---

abdomen. The major complication of an untreated abdominal wall hernia can be incarceration and strangulation of a segment of bowel. Incarceration occurs when a loop of bowel becomes trapped in the defect, and cannot be reduced. An incarcerated loop of bowel can become strangulated when the flow of bowel contents is obstructed and the blood supply to the incarcerated loop is cut off. A strangulated hernia requires urgent surgery." (Doc. # 133-1 at 23-24.)

1  the decision not to treat the umbilical hernia surgically was medically acceptable under the

2  circumstances.

3  ### c. Ganglion Cyst

4  With respect to the ganglion cyst (a claim which is also asserted only against defendant

5  Martin in Count II), defendant Martin asserts that this was never documented in Plaintiff's

6  medical records. (Doc. # 133-1 at 25.)[15] The only reference is in Plaintiff's 2009 grievance where

7  Plaintiff references a failure to treat a ganglion cyst in his right wrist. (*Id*.) Dr. Hellerstein

8  opines that whether or not Plaintiff had a ganglion cyst, it was asymptomatic as there is no

9  record of Plaintiff complaining of pain from the cyst and no record documenting it; therefore,

10  it would not have required treatment. (*Id*.)

11  The court finds that Plaintiff's motion for summary judgment should be denied insofar

12  as he claims defendant Martin was deliberately indifferent when he failed to provide treatment

13  for Plaintiff's ganglion cyst because Plaintiff presents no evidence that defendant Martin knew

14  of his ganglion cyst, that it was presented in his medical records at any time before he saw

15  defendant Martin or that he complained of a ganglion cyst to defendant Martin. Moreover, even

16  if there was evidence that defendant Martin knew Plaintiff suffered from a ganglion cyst, he has

17  not provided evidence to demonstrate that any delay in providing treatment caused him any

18  harm. Therefore, Plaintiff failed to meet his burden in moving for summary judgment on this

19  claim.

20  Defendant Martin has met his burden of demonstrating that Plaintiff lacks evidence to

21  prove that he acted with deliberate indifference relative to Plaintiff's ganglion cyst because his

22  medical records do not reference a ganglion cyst. Nor is there any other evidence which would

23  establish defendant Martin knew of and disregarded an excessive risk to Plaintiff's health.

24  Therefore, the court finds that summary judgment should be granted in favor of defendant

---

26  [15]Dr. Hellerstein  defines a ganglion cyst as "a cystic swelling overlying a joint or tendon sheath"

27  commonly occurring in the wrist and "may present as an obvious swelling on physical examination, or may only be manifested by joint (particularly wrist) pain. Ganglia may spontaneously regress or recur. Thus, expectant management is appropriate if the mass is not painful or interfering with function." (Doc. # 133-1 at 25.)

1    Martin on Plaintiff's Eighth Amendment claim in Count II related to his ganglion cyst.

2    **C. First Amendment Retaliation**

3        **1. Standard**

4        A plaintiff may state a claim for violation of his or her First Amendment rights due to

5    retaliation under 42 U.S.C. § 1983. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such

6    a claim consists of five elements: "(1) An assertion that a state actor took some adverse action

7    against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

8    (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

9    reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68

10   (9th Cir. 2005) (citations omitted); *see also Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.

11   2009) (quoting *Rhodes*, 408 F.3d at 567-68). Retaliation claims must be evaluated in light of

12   the deference that must be accorded to prison officials. *See Pratt*, 65 F.3d at 807.

13      **2. Analysis**

14      First, the court finds that Plaintiff, as the moving party, has not demonstrated he would

15   be likely to obtain a directed verdict on his retaliation claim because he has not come forward

16   with evidence to support the allegation that Saunders and Lyon trashed his cell and took his

17   legal materials *because* he engaged in protected conduct—filing medical grievances.

18      On the other hand, the court finds that defendants Lyons and Saunders have successfully

19   demonstrated Plaintiff cannot establish the "because of" element of his retaliation claim;

20   therefore, summary judgment should be granted in their favor.

21      Even taking Plaintiff's version of events as true, that Saunders made some sort of

22   overture to Plaintiff shortly before his cell was trashed and legal materials were taken (*see* Doc.

23   # 150 at 3 ¶¶ 12-13), Plaintiff provides no evidence that the alleged retaliatory conduct was done

24   *because of* Plaintiff's *protected conduct*-filing medical grievances-as he alleges in his complaint.

25   In his declaration, Plaintiff states, "[w]hether the cell trashing was a rebuff for Plaintiff refusing

26   the homosexual advance of SANDERS or for having filed the medical grievances, it was clearly

27   retaliation and served no legitimate state purpose." (Doc. # 150 at 3 ¶ 14.) While Plaintiff

28   

asserts that there was no legitimate purpose for the conduct, he must still provide evidence that the action was taken because of his protected conduct. Plaintiff's brief makes reference to "circumstantial evidence relating the incident in time to the grievances filed by Plaintiff" which he asserts "establish[ ] the requisite link between the exercise of constitutional rights and the retaliatory action." (Doc. # 145 at 9:15-18.) It is true that timing of events surrounding the alleged retaliatory action may constitute circumstantial evidence of retaliatory intent, but Plaintiff does not point out where this circumstantial evidence can be found. Assuming Plaintiff is referring to grievances he filed, he does not point out which grievances might constitute circumstantial evidence of retaliatory intent.

Plaintiff's mere speculation (*see* Doc. # 119 at 44) that this was done in retaliation for filing grievances is insufficient. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment") (citation omitted). Plaintiff includes one sentence in his opposition making reference to statements made by other guards that this was done because Plaintiff filed grievances or a lawsuit (*see* Doc. # 119 at 48) does not carry the day. Plaintiff cannot merely rely on his conclusory allegations unsupported by factual data. *See, e.g., T.W. Elec. Serv.*, 809 F.2d at 630; *see also Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e). Plaintiff does not identify the guards that supposedly made these statements, nor does he provide declarations from them, or even reference their statements in his own declaration. Simply stated, Plaintiff has not produced competent evidence to support the causation element of his retaliation claim either to show the absence of a genuine issue of material fact for his motion for summary judgment or to raise a genuine issue of material fact to defeat Defendants' motion for summary judgment.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations

1  omitted).

2  Defendants provide their own declarations which state that Plaintiff was residing in a

3  lockdown unit which was searched with some frequency and they were unaware of Plaintiff's

4  grievance activity regarding any issue and were similarly unaware of Plaintiff's litigation

5  activity. (Lyons Decl. (Ex. G to Defs.' Mtn for Sum. J.); Saunders Decl. (Ex. H to Defs.' Mtn for

6  Sum. J.).) With no evidence that the search was conducted because of Plaintiff's grievance

7  activity, summary judgment should be granted in favor of defendants Lyons and Saunders on

8  Plaintiff's retaliation claim.

9  **D. Official Capacity Damages**

10  A state official sued in his or her official capacity for *damages* is not a person subject

11  to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Claims

12  against defendants in their official capacities are actually suits against the entity of which the

13  named defendants are agents. *See Kentucky v. Graham*, 473 U.S. 159 (1985). "As long as the

14  government entity receives notice and an opportunity to respond, an official-capacity suit is,

15  in all respects other than name, to be treated as a suit against the entity." *Id*. at 166. The real

16  party in interest in such suits is the entity itself, and the entity, not the named defendant, will

17  be liable for any damages. *Id*. Therefore, the official capacity damages claims against the

18  remaining defendants should be dismissed.

19  **E. Qualified Immunity**

20  "Qualified immunity shields federal and state officials from money damages unless a

21  plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

22  (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v.*

23  *al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

24  (1982)); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (citation omitted)

25  ("Qualified immunity protects government officials from civil damages 'insofar as their conduct

26  does not violate clearly established statutory or constitutional rights of which a reasonable

27  person would have known.*");Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir. 2012); *Pearson v.*

28

1   *Callahan*, 555 U.S. 223 (2009).

2   "Whether qualified immunity applies thus 'turns on the objective legal reasonableness

3   of the action, assessed in light of the legal rules that were clearly established at the time it was

4   taken.'" *Chappell*, 706 F.3d at 1056 (quoting *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245

5   (2012)). In other words, a "[g]overnment official's conduct violates clearly established law

6   when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'

7   that every 'reasonable official would have understood that what he is doing violates that right.'"

8   *al-Kidd*, 131 S.Ct. at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S.

9   635, 640 (1987)); *see also Padilla,* 678 F.3d at 758 (citation omitted).

10   "[A] case directly on point [is not required], but existing precedent must have placed the

11   statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083. "Qualified

12   immunity gives government officials breathing room to make reasonable but mistaken

13   judgments about open legal questions," and courts are "not to define clearly established law at

14   a high level of generality[.]" *Id.* at 2084-85; *see also Dunn v. Castro*, 621 F.3d 1196, 1201 (9th

15   Cir. 2010) ("[T]he right allegedly violated must be defined at the appropriate level of specificity

16   before a court can determine if it was clearly established.").

17   Whether a constitutional right was violated and whether the right was clearly established

18   at the time of the violation are legal questions for the court. *See Serrano v. Francis*, 345 F.3d

19   1071, 1080 (9th Cir. 2003); *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

20   However, "[i]f a genuine issue of material fact exists that prevents a determination of qualified

21   immunity at summary judgment, the case must proceed to trial." *Serrano*, 345 F.3d at 1077.

22   When the court conducts a qualified immunity analysis, it must view the facts in the light most

23   favorable to the prisoner plaintiff. *Chappell*, 706 F.3d at 1057 (citations omitted).

24   Plaintiff's remaining claims allege the denial or delay of medical care relative to his

25   spinal stenosis and umbilical hernia. Viewing the facts in the light most favorable to Plaintiff,

26   the court finds it was clearly established during the relevant time frame that denial, delay of,

27   or interference with medical care of a prisoner constitutes an Eighth Amendment violation if

28   45

it amounts to deliberate indifference to a serious medical need. *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986), *abrogated on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Moreover, genuine issues of material fact remain as to these claims. Therefore, the court finds Defendants should not be entitled to qualified immunity.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **DENYING** Plaintiff's motion for summary judgment, and **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment as follows:

(1) Defendants Brackbill, Gibbons, Miller, Cortez Masto and Skolnik should be granted summary judgment as to Plaintiff's Eighth Amendment claim against them, asserted in Count I;

(2) The motion for summary judgment of defendants Bannister, McDaniel and Martin as to Plaintiff's Eighth Amendment claim related to treatment and care for his spinal stenosis in Count I should be denied because of the existence of genuine issues of material fact;

(3) The motion for summary judgment of defendant Martin as to Plaintiff's Eighth Amendment claim related to treatment and care for his umbilical hernia in Count II should be denied because of the existence of genuine issues of material fact;

(4) The motion for summary judgment of defendant Martin as to Plaintiff's Eighth Amendment claim related to treatment and care for his ganglion cyst in Count II should be granted;

(5) Defendants Lyons and Saunders should be granted summary judgment on Plaintiff's retaliation claim in Count III;

**IT IS HEREBY FURTHER RECOMMENDED** that the District Judge enter an Order specifying that:

(1) the official capacity damages claims against the remaining defendants be dismissed;

46

(2) Defendants' request for qualified immunity be denied; and

(3) this case will proceed as to Plaintiff's Eighth Amendment claim in Count I related to his spinal stenosis against defendants Bannister, McDaniel, and Martin, and Plaintiff's Eighth Amendment claim in Count II related to his umbilical hernia against defendant Martin.

The parties should be aware of the following:

1.     That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.     That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: July 24, 2013.

WILLIAM G.  COBB
UNITED STATES MAGISTRATE JUDGE

47